Li Yu (pro hac vice)
**BERNSTEIN LITOWITZ**
**BERGER & GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1926
Email: li.yu@blbglaw.com

Mark Pugsley (Utah Bar No. 8253)
**PUGSLEY WOOD LLP**
350 E. 400 S, Suite 400
Salt Lake City, UT 84111
Tel: (801) 370-9800
Email: mark@pugsleywood.com
*Attorneys for the* Qui Tam *Relator*

---

# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF UTAH

---

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel*. CHARLES WOLF, M.D., | Case: 2:20-cv-00623 |
| | Assigned To : Nielson, Howard C., Jr |
| Plaintiff-Relator, | |
| v. | **FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT,** |
| INTERMOUNTAIN HEALTHCARE, INC.; UTAH EMERGENCY PHYSICIANS, P.C.; SOUTHWEST EMERGENCY PHYSICIANS, L.C.; ROCKY MOUNTAIN EMERGENCY SPECIALISTS, LLC; and, R1 RCM, INC., | **31 U.S.C. § 3729** *et seq.* |
| | **JURY DEMANDED** |
| Defendants. | |

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................ 1

II.   PARTIES AND ENTITIES ....................................................................... 5

    A.    Relator ............................................................................................. 5

    B.    Defendants ....................................................................................... 5

III.  JURISDICTION AND VENUE ............................................................... 8

IV.   THE FALSE CLAIMS ACT .................................................................... 9

V.    GOVERNMENT HEALTHCARE PROGRAMS AFFECTED BY DEFENDANTS' FALSE BILLINGS ...................................................... 11

    A.    Medicare ........................................................................................ 11

        1.    Generally ............................................................................. 11

        2.    Medicare Part B ................................................................. 12

        3.    Medicare Part C ................................................................. 14

        4.    To Participate in Medicare Part B and Part C, Providers Are Required to Be Familiar and Comply with Billing and Coding Requirements ......................................... 15

    B.    Medicaid ........................................................................................ 18

    C.    TRICARE ...................................................................................... 20

    D.    Veterans Administration Health Benefits Programs....................... 22

    E.    The Federal Employee Health Care Programs................................ 23

VI.   BILLING FOR PHYSICIAN EMERGENCY ROOM SERVICES............... 24

    A.    CPT Codes 99281-99285 ............................................................. 24

        1.    CPT Code 99281 ................................................................ 25

        2.    CPT Code 99282 ................................................................ 26

        3.    CPT Code 99283 ................................................................ 27

        4.    CPT Code 99284 ................................................................ 28

        5.    CPT Code 99285 ................................................................ 28

B.      Medicare Reimbursement Rates for Levels of ER E&M Services ....................... 30

VII.    THE GOVERNMENT HAS CONSISTENTLY ENFORCED REQUIREMENTS
        FOR CORRECT CODING OF ER E&M SERVICES ...................................................... 31

VIII.   DEFENDANTS' VIOLATIONS OF THE FCA ................................................................ 33

        A.      Defendants' Awareness of Medicare's and Other Government Healthcare
                Programs' Requirements to Properly Code ER E&M Services ........................... 33

        B.      Defendants' Awareness of Widespread Upcoding of ER E&M Services
                Across the Intermountain Hospital System ........................................................... 35

        C.      Upcoding of ER E&M Services to Level 5 Continued to Be Pervasive and
                Persistent at Intermountain Hospitals After the Noridian Audit .......................... 38

        D.      Relator Confirmed the Duration, Frequency, and Pervasiveness of
                Upcoding of ER E&M Services Through His Independent Review ..................... 42

                1.      Relator's Review of ER E&M Services at 10 Intermountain
                        Hospitals ................................................................................................. 42

                2.      Representative Examples of False Claims Identified by Relator
                        Due to Defendants' Practice of Upcoding ER E&M Services ................. 43

        E.      In September 2020, Intermountain Executives Continued to Pressure Staff
                to "Code [ER E&M Services] More Aggressively" .............................................. 53

        F.      Even After the Filing of This Action, Intermountain Continued to
                Minimize Its Upcoding Practice and to Avoid Refunding Overpayments ........... 55

        G.      Defendants UEP, SWEP, RMES, and R1 Have Knowingly Submitted or
                Caused the Submission of False Claims and False Statements ............................ 56

CLAIMS FOR RELIEF ................................................................................................................ 57

DEMANDS FOR RELIEF ............................................................................................................ 61

JURY DEMAND ........................................................................................................................... 62

This is a *qui tam* action brought by relator Charles J. Wolf, M.D. ("Relator") on behalf of the United States (the "Government") under the False Claims Act, 31 U.S.C. § 3729 *et seq*. (the "FCA"), to recover treble damages and civil penalties in connection with the long-standing and unlawful practices of Defendants Intermountain Healthcare, Inc. ( "Intermountain" or "IHC"); Utah Emergency Physicians, P.C. ("UEP"); Southwest Emergency Physicians, L.L.C. ("SWEP"); Rocky Mountain Emergency Specialists, LLC ("RMES"); and R1 RCM, Inc. ("R1") to improperly "up-code" emergency room physician evaluation and management ("ER E&M") services at 21 Intermountain hospitals to obtain higher reimbursements from Medicare, Medicaid, and other government healthcare programs.[1]

## I.    INTRODUCTION

1.    Intermountain is the largest healthcare provider in Utah. Each year, hundreds of thousands of patients are treated in the emergency rooms at its 23 hospitals. From at least 2015 to at least 2022, Intermountain has knowingly benefitted from a pervasive and widespread practice of upcoding of ER E&M services throughout its hospitals. Each year, Intermountain falsely billed tens of thousands of such services at the highest level of complexity, *i.e.*, level 5 with Current Procedure Terminology ("CPT") code 99285, when medical records did not support such billing.

2.    Financially, level 5 ER E&M service is reimbursed at a significantly higher rate. In 2020, for example, Medicare paid 45% more for level 5 services than for level 4 services. Intermountain, thus, reaped significant financial benefits from upcoding. *See infra* ¶¶ 115-117. Further, UEP, SWEP, and RMES, which supplied ER doctors to Intermountain, and R1, which

---

[1]    The Government has settled Relator's claims as to E&M upcoding at the Cassia Regional and McKay-Dee hospitals. *See infra* ¶¶ 203. Relator is not pursuing claims as to those two hospitals.

performed billing services for Intermountain, benefitted financially from upcoding under the performance incentive provisions of their contracts with Intermountain.

3.      Intermountain, the three physician staffing groups (UEP, SWEP, and RMES), and R1 also all were well aware of both the prevalence and the persistence of this ER E&M upcoding practice across the Intermountain hospital system. In late 2014 and early 2015, for example, Intermountain, UEP, and SWEP saw the results of a wide-ranging Medicare audit of ER E&M services at 16 Intermountain hospitals. That audit found that *70%* of the E&M services that Intermountain billed as level 5 (*i.e.*, with CPT 99285) had been improperly upcoded. *See* Ex. 1.

4.      The 2014 Medicare audit put Defendants squarely on notice of their responsibility to revamp their coding practice for ER E&M services. In a January 29, 2016, email, for example, a compliance director at Intermountain emphasized the need to "focus on two things"—1) "what the coding standard at Intermountain is regarding level 5 [ER] E&M codes" and 2) "IH[C]'s risk level in regards to level 5 coding." *See infra* ¶¶ 141-143.

5.      In practice, however, Defendants chose not to make the changes necessary to comply with their obligation to follow Medicare billing requirements and to avoid upcoding. In May 2016, for example, Intermountain conducted a "probe audit" of "Level 5 [ER] E&M Coding" at its "Central Region Hospitals" plus "McKay Dee Hospital." That internal audit found "**the *error rate to continue at approximately 50%***" at those hospitals. *See* Ex. 1 (emphasis added).

6.      Similarly, in early October 2018, Intermountain and RMES were notified by OptumCare Utah, which conducts utilization review for Medicare Advantage plans, that "a claims review" showed that physicians at Intermountain and RMES were "'outliers' on the submission of claims" for ER E&M services with "CPT 99285[.]" Specifically, Optum found that "your billing

office is an **outlier compared to national and State Utah Medicaid program[]** regarding the coding of Emergency Department E&M services." *See* Ex. 2 (emphasis added).

7.      Despite these repeated red flags from internal and external audits, Defendants turned a blind eye to the persistence of the ER E&M upcoding practice across the Intermountain hospital system. For example, Intermountain had a written policy that called for a detailed review to estimate overpayments if an internal audit found error rates "in excess of 5%." *See* Ex. 3.

8.      For level 5 ER E&M services, however, Intermountain chose to ignore internal audits finding error rates well over 10% or 15%. Until at least 2020, as internal emails show, Intermountain made it practice to both (A) ignore all internal audit findings where level 4 ER E&M services were upcoded to level 5 and (B) avoid any detailed review when internal audits showed "[a] provider's error rate [does not] **exceed[] 20%**." *See infra* ¶¶ 157-159 (emphasis added).

9.      In 2020, in recognition of his extensive medical coding experience, Relator was asked by Intermountain to advise on the appropriate coding for ER E&M services after he returned in December 2019 as a director of corporate compliance.[2]

10.     This quickly revealed the pervasiveness of upcoding at Intermountain. For example, a "statistically valid" internal audit in 2019 found that 69% of level 5 E&M services at the McKay-Dee Hospital ("McKay") and 72% of such services at the Cassia Regional Hospital ("Cassia") had been up-coded. Further, as a divisional chief financial officer ("CFO") at Intermountain acknowledged in a December 2019 internal email, "the exposure at McKay demonstrates potential exposure in the Salt Lake Valley facilities," which include several of the largest hospitals within the Intermountain system. *See infra* ¶¶ 151-152.

---

[2]     Relator previously worked at Intermountain from 1999 to 2006. *See infra* ¶ 15.

11.     Relator came to the same conclusion in August 2020 after he analyzed a sample of ER E&M services across 10 different Intermountain hospitals. Out of approximately 100 such services, Relator found that 52—approximately 50%—had been upcoded. In many cases, the use of the level 5 E&M service billing code (99285) clearly conflicted with Intermountain's internal guidance and the findings of payor audits. For example, Intermountain applied the 99285 code to ER visits where patients complained of "generalized abdominal pain," abdominal pain in "stable condition," "back pain" and were promptly discharged. *See infra* ¶¶ 167-172. According to Intermountain's own guidance, however, the 99285 code is "inappropriate" unless the patient's "current presentation truly posed a threat to life or bodily function." *See* Ex. 4 at 3.

12.     Relator also witnessed the cavalier attitude that Intermountain executives had toward upcoding. In a September 2020 meeting, for example, a divisional CFO at Intermountain encouraged more aggressive coding, going as far as admonishing employees ***not*** to bill Medicare in a way so that "we would always pass an audit with 100%" because this "would leave a lot of money on the table." After this meeting, members of the coding team at Intermountain told Relator in emails that the division CFO's statements were nothing short of a "veiled threat" and a directive to "over-code or don't get paid." *See infra* ¶¶ 194-199.

13.     Indeed, after Intermountain identified and quantified in late 2019 the Medicare overpayments it had received due to upcoding at the Cassia and McKay hospitals, it flouted its obligation under federal law to return those overpayments within 60 days. It was only after the Government was notified of Relator's claims in this *qui tam* case that Intermountain finally agreed to repay Medicare for the upcoding at those two hospitals.

14.     Finally, even after Intermountain acknowledged the overpayments at Cassia and

McKay, it has continued to conceal the full scale of upcoding of ER E&M services across its hospital system—despite its divisional CFO's acknowledgement that the upcoding at Cassia and McKay revealed "potential exposure in Salt Lake Valley facilities." Accordingly, Relator seeks full recovery for the Government under the *qui tam* provisions of FCA for **all** the overpayments that Intermountain has improperly obtained and retained as result of the upcoding practices in emergency rooms across its hospital system as well as appropriate civil penalties.

## II.    PARTIES AND ENTITIES

### A.    Relator

15.    Relator Charles J. Wolf, M.D., resides in Utah and is an accredited health care compliance professional and a certified professional medical coder. From December 2019 to October 2020, Relator worked as the Director of Corporate Compliance at Intermountain. Relator also had worked at Intermountain as from 1999 to January 2006, first as a Senior Consultant I/II and then an Ambulatory Coding and Reimbursement Senior Consultant III/Manager. Relator brings this matter under the FCA on behalf of the Government, which Government acts through its various agencies and departments, including the Department of Health and Human Services ("HHS"), which administers Medicare and Medicaid through the Centers for Medicare and Medicaid Services ("CMS"); the Department of Defense ("DOD"), which administers TRICARE through Defense Health Agency; and other relevant government payors.

### B.    Defendants

16.    Defendant Intermountain is a Utah-based healthcare system that, during the relevant times, operated 23 hospitals in Utah, a medical group of more than 2,400 physicians and advanced practice clinicians at about 160 clinics, a health plans division, and other health services.

Intermountain is headquartered at 36 South State Street, Suite 2200 in Salt Lake City and operates primarily in Utah and neighboring states. Intermountain's largest hospitals include Intermountain Medical Center, Primary Children's Hospital, LDS Hospital, Utah Valley Hospital, St. George Regional Medical Center (formerly known as Dixie Regional), and the McKay Hospital.[3] More specifically, the 23 hospitals in Intermountain's system at issue were:

- Alta View Hospital (Sandy, Utah)
- American Fork Hospital (American Fork, Utah)
- Bear River Valley Hospital (Tremonton, Utah)
- Cassia Regional Hospital (Burley, Idaho)
- Cedar City Hospital (Cedar City, Utah)
- Delta Community Hospital (Delta, Utah)
- St. George Regional Medical Center (St. George, Utah)[4]
- Fillmore Community Hospital (Fillmore, Utah)
- Garfield Memorial Hospital (Panguitch, Utah)
- Heber Valley Hospital (Heber City, Utah)
- Intermountain Medical Center (Murray, Utah)
- Layton Hospital (Layton, Utah)
- LDS Hospital (Salt Lake City, Utah)
- Logan Regional Hospital (Logan, Utah)
- McKay-Dee Hospital (Ogden, Utah)
- Orem Community Hospital (Orem, Utah)

---

[3]    As discussed above, the Government previously settled claims arising from Intermountain's alleged upcoding practices at the Cassia and McKay hospitals. Relator, therefore, is not pursuing claims relating to upcoding at those two hospitals and, instead, the other 21 Intermountain hospitals.

[4]    At the time this case was filed in 2020, the St. George Regional Medical Center was called the Dixie Regional Medical Center and referred to as "Dixie" in Intermountain's records.

- Park City Hospital (Park City, Utah)

- Primary Children's Hospital (Salt Lake City, Utah)

- Riverton Hospital (Riverton, Utah)

- Sanpete Valley Hospital (Mt. Pleasant, Utah)

- Sevier Valley Hospital (Richfield, Utah)

- The Orthopedic Specialty Hospital (Murray, Utah)

- Utah Valley Hospital (Provo, Utah)

17.    Defendant UEP is a Utah professional corporation and is located at 5171 South Cottonwood Street, Suite 740, Murray, Utah 84107. According to Intermountain's records, RMES contracted with Intermountain to provide professional emergency physician services, including at the McKay hospital and several large hospitals in the Salt Lake Valley like the Intermountain Medical Center and the LDS Hospital. As relevant here, UEP routinely rotated many of its ER physicians across those different Intermountain facilities.

18.    Defendant SWEP is a Utah limited liability company and is located at 1380 East Medical Center Drive, St. George, Utah 84790. According to Intermountain's records, SWEP contracted with Intermountain to provide professional emergency physician services, including at the St. George Regional Medical Center (formerly known as the Dixie Regional Medical Center).

19.    Defendant RMES is a Utah limited liability company and is located at 255 N. Hillside Drive, Logan, Utah 84341. According to Intermountain's records, RMES contracted with Intermountain to provide professional emergency physician services, including at the Logan Regional Hospital.

20.    Defendant R1 is a Delaware corporation with its headquarters at 433 W. Ascension Way, Suite 200, Murray, Utah 84123. R1 provides revenue cycle management ("RCM") and

physician advisory services ("PAS") to hospitals and other medical services providers. At Intermountain, R1's responsibility included, *inter alia*, the coding of ER E&M services at certain hospitals. Its primary service offering consists of end-to-end RCM, which it deploys through a co-managed relationship or an operating partner relationship.[5]

## III.    JURISDICTION AND VENUE

21.    The Court has subject matter jurisdiction over the FCA claims alleged in this complaint under 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a). Further, Relator is aware of no subject matter or other jurisdictional bars under the FCA that would be applicable to this action. Relator likewise is aware of no statutorily relevant public disclosure of the allegations or transactions forming the core elements of the claims against Defendants. Further, even if such a disclosure had occurred, Relator is the "original source"—as that term is used in the FCA—of the allegations in this complaint. During his tenure at Intermountain, Relator acquired material, direct, independent, and non-public knowledge of the information on which the allegations in this complaint are based. Relator voluntarily and in good faith disclosed this information to the United States Attorney's Office for the District of Utah before filing this complaint.

22.    This Court has personal jurisdiction over each Defendant because 31 U.S.C. § 3732(a) because each entity can be found in, resides in, or transacts business in this District.

23.    Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because each Defendant can be found, resides, and transacts business in this district; because an

---

[5]    R1 assists hospitals in complying with payer requirements regarding whether to classify a hospital visit as an inpatient or an outpatient observation case for billing purposes. R1 also provides retrospective appeal management service support for payers and performs retrospective reviews of medical records to identify medical necessity for hospital services and the required documentation to support an appeal.

act proscribed by 31 U.S.C. § 3729 occurred within this District; and because a substantial part of the events or omissions giving rise to the claims alleged in this complaint occurred in this District.

## IV.    THE FALSE CLAIMS ACT

24.    The FCA, also known as "Lincoln's Law," was originally enacted during the Civil War to combat endemic fraud in federal procurement. Congress substantially amended the FCA in 1986—and further amended the statute in 2009 and 2010—to enhance the ability of the United States to recover losses sustained as a result of fraud against it. Congress amended the FCA after finding that fraud affecting federal programs was pervasive and that the FCA—which Congress characterized as the primary tool for combating government fraud—was in need of modernization and updates. Congress intended for the amendments to the FCA to create incentives for individuals with knowledge of fraud affecting federal programs to disclose the information without fear of reprisals or government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on behalf of the Government.

25.    *First*, the FCA's "presentment" provision, 31 U.S.C. § 3729(a)(1)(A), imposes liability when a defendant (a) made, or caused to be made, a claim, (b) that was false or fraudulent, (c) knowing of its falsity.

26.    *Second*, the FCA's "false records or statements" provision, 31 U.S.C. § 3729(a)(1)(B), imposes liability when a defendant (a) made, used, or caused to be made or used, a record or statement, (b) that was knowingly false, and (c) that was material to a false or fraudulent claim.

27.    *Third*, the FCA's "reverse false claims" provision, 31 U.S.C. § 3729(a)(1)(G), imposes liability when a defendant (a) "knowingly makes, uses, or causes to be made or used, a

false record or statement material to an obligation to pay or transmit money or property to the Government" or (b) "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."

28.    *Fourth*, the FCA's "conspiracy" provision, 31 U.S.C. § 3729(a)(1)(C), imposes liability for conspiring to violate the FCA's presentment provision, the false records or statements provision, or the reverse false claims provision.

29.    The FCA defines the terms "knowing" and "knowingly" to mean "that a person, with respect to information—(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." *Id*. § 3729(b)(1)(A). The FCA does not require proof of specific intent to defraud. *See id*. § 3729(b)(l)(B).

30.    the term "claim" means any request or demand for money, whether under a contract or otherwise, presented to an officer, employee, or agent of the United States. 31 U.S.C. § 3729(b)(2)(A)(i). A "claim" is also a request or demand for money made to a contractor or other recipient if (a) the money is to be spent or used on the Government's behalf or to advance a Government program or interest and (b) if the Government provides, has provided, or will reimburse such contractor or other recipient for any portion of the money requested or demanded. 31 U.S.C. § 3729(b)(2)(A)(ii).

31.    The FCA defines the term "obligation" to mean an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment. 31 U.S.C. § 3729(b)(3).

32.     As relevant here, Congress has defined an "overpayment" as "any funds that a person receives or retains under [the Medicare and Medicaid statutes] to which the person, after applicable reconciliation, is not entitled." 42 U.S.C. § 1320a–7k(d)(4)(B). Further, a person or entity that receives a Medicare or Medicaid overpayment must report and return the overpayment within 60 days of the date on which the overpayment was identified. *Id*. § 1320a–7k(d)(1)–(2). Thus, "obligations" include, but are not limited to, "any overpayment [from Medicare] retained by a person after the deadline for reporting and returning an overpayment." *See* 79 Fed. Reg. 29,843, 29,918 (May 23, 2014).

33.     The FCA defines "material" objectively to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). The Supreme Court reaffirmed the natural tendency materiality test—even as to subsection (a)(1)(A), which does not explicitly use the term—and described a holistic approach to analyzing it. *See Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016).

## V.     GOVERNMENT HEALTHCARE PROGRAMS AFFECTED BY DEFENDANTS' FALSE BILLINGS

### A.     Medicare

#### 1.     Generally

34.     Title XVIII of the Social Security Act ("Medicare") is a federally subsidized health insurance system for persons who are eligible based on age (over 65), disability, or affliction with end-stage renal disease. 42 U.S.C. §§ 426, 426-1, 426A.

35.     HHS is responsible for the administration and supervision of the Medicare program. CMS, formerly known as the Health Care Financing Agency ("HCFA"), is an agency of HHS and

is directly responsible for the administration of the Medicare program.

36.     CMS contracts with private contractors referred to as "fiscal intermediaries," "carriers," and Medicare Administrative Contractors ("MACs") to act as agents in reviewing and paying claims submitted by health care providers. 42 U.S.C. §§ 1395h, 1395u; 42 C.F.R. §§ 421.3, 421.100, 421.104. Fiscal intermediaries, typically insurance companies, are responsible for processing and paying claims for reimbursement.

37.     Medicare's general coverage parameters only include items that are "provided economically and only when, and to the extent, medically necessary . . ." 42 U.S.C. § 1320c-5(a)(1). Medicare's coverage also excludes goods and services that are not medically "reasonable and necessary." 42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 411.15(k).

38.     To seek reimbursement from Medicare and the other Government Healthcare Programs described below, a health care provider must obtain a unique billing identification number ("NPI"). The provider also must submit an enrollment application.

39.     Medicare is divided into four parts with separate coverage authorities: Medicare Part A (hospital insurance); Medicare Part B (medical insurance); Medicare Part C (Medicare Advantage); and Medicare Part D (prescription drug coverage). In this action, only Medicare Part B is relevant.

### 2.     Medicare Part B

40.     Medicare Part B is a voluntary subscription program of supplementary medical insurance covering outpatient care, including physician services and ancillary services. 42 U.S.C. § 1395k.

41.     Defendants billed Medicare or caused Medicare to be billed under Part B, which covers certain medical services furnished by physicians and other providers and suppliers. 42 U.S.C. § 1395k(a)(2)(B).

42.     Typically, physicians are compensated for the services they provide Medicare patients on a fee-for-service basis as determined by Medicare's fee schedule. 42 U.S.C. § 1395w-4. To obtain compensation, physicians must deliver a compensable service, certify that the service was medically necessary for the health of the patient, certify that the service was personally furnished by the physician (or under his or her immediate supervision), and determine the appropriate diagnosis and procedure code to describe the problem and service for billing.

43.     The Medicare statute requires that each request for payment or bill submitted for an item or service payable under Medicare Part B must include the name and unique physician identification number for the referring physician. 42 U.S.C. § 1395l(q)(1).

44.     To obtain Medicare and Medicaid reimbursement for certain outpatient items or services, providers and suppliers submit a claim form known as the CMS 1500 form ("CMS 1500") or its electronic equivalent known as the 837P form. Among the information the provider or supplier includes on a CMS 1500 or 837P form are certain five-digit codes, including Current Procedural Terminology codes ("CPT codes") and Healthcare Common Procedure Coding System ("HCPCS") Level II codes, that identify the services rendered and for which reimbursement is sought, and the NPI of the "rendering provider" and the "referring provider or other source."

45.     Medicare only pays for Part B services that are actually rendered and are reasonable and medically necessary. 42 U.S.C. § 1395y(a). Part B providers also must certify that services are medically necessary. 42 C.F.R. § 424.24(g)(1).

46.     Medicare requires proper and complete documentation of the services rendered to beneficiaries. 42 U.S.C. § 1395l(e).

### 3.    Medicare Part C

47.     Under the Medicare Advantage ("MA") Program, commonly referred to as Part C, a Medicare beneficiary can opt out of the traditional Medicare Program (Parts A and B) and enroll in an MA plan managed by a Medicare Advantage Organization ("MAO"), which is often a private insurance carrier like Aetna or UnitedHealth. *See* 42 U.S.C. §§ 1395w-21–1395w-28.

48.     MAOs contract with CMS to provide MA healthcare plans to people who are eligible for Medicare Part C. *See id*. MA plans must provide Medicare beneficiaries with all the services that they are entitled to receive from the traditional Medicare program, at a minimum, subject to limited exceptions. As relevant here, MA plans cover ER E&M services provided in hospitals to their enrolled Medicare beneficiaries.

49.     A Medicare beneficiary who enrolls in an MA plan is considered a member of and enrollee in that plan. In 2023, more than half of eligible beneficiaries elected to receive their Medicare coverage in this manner. Medical services provided to Medicare beneficiaries enrolled in MA plans, including ER E&M services, are billed to MA plans for payment. The MAOs make payments for such items and services using funds provided by CMS.

50.     As a basic condition for receiving federal funding, an MAO must enter into a contract with CMS known as the Master Application. *See* 42 C.F.R. § 422.503. CMS has enacted regulations to require the Master Application to contain certain key provisions. Specifically, CMS regulations require that each MAO must "agree[] to comply with (1) Federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to, … the

False Claims Act (31 U.S.C. 3729 *et. seq.*) [.]" *Id*. § 422.504(h)(1).

51.     CMS regulations further specify that the same compliance obligations flow to "first-tier" and "downstream entities" like hospitals that receive payments from MAOs for ER E&M services. When MAOs contract with hospitals to provide healthcare services to Medicare beneficiaries, these contracts must, under CMS regulations, require the contracting entities, including hospitals, to "comply with the [MAO's] contractual obligations." *Id*. § 422.504.

### 4.     To Participate in Medicare Part B and Part C, Providers Are Required to Be Familiar and Comply with Billing and Coding Requirements

52.     A provider must enroll in the Medicare program to receive Medicare reimbursement for covered services provided to eligible beneficiaries. To participate in the Medicare program, a provider must file a provider agreement with the Secretary of HHS ("the Secretary"). *See* 42 U.S.C. § 1395cc. The provider agreement requires compliance with the requirements that the Secretary deems necessary for participation in the program. *Id*.

53.     Among other things, participating providers are prohibited from making false statements or representations of material facts concerning payment requests. *See* 42 U.S.C. §§ 1320a-7b(a)(1) and (2); *id*. § 1320a-7a(1); 42 C.F.R. § 1001.101(a). Providers are also required to know the information contained in HHS, CMS, and fiscal intermediary notices, including manual issuances, bulletins, and other written guides and directives. *See* 42 C.F.R. § 411.406.

54.     The enrollment application includes a certification statement requiring the enrolling provider to certify the provider's adherence to a list of requirements, including, among others, the following:

- Familiarity with and agreement to abide by applicable Medicare or other federal health care program laws, regulations, and program instructions, which are available through the Medicare contractor;

- Understanding that payment of a claim by Medicare or other federal health care programs is conditioned on the claim and the underlying transaction complying with such laws, regulations and program instructions (including the anti-kickback statute and the Stark law), and on a provider/supplier complying with any applicable conditions of participation in any federal health care program; and

- Agreement not to knowingly present or cause to be presented a false or fraudulent claim for payment by the Medicare or other federal health care programs and not to submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

55.     At all times material to this action, Defendants (except R1) received reimbursement from Medicare and, therefore, had signed a Medicare enrollment application and/or had entered a Medicare provider agreement as described above.

56.     By signing a Medicare enrollment application, Defendants expressly agreed to abide by applicable Medicare laws, regulations, and program instructions, which they acknowledged are available through the Medicare contractor. Defendants also certified that they understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions and on their own compliance with all applicable conditions of participation in Medicare.

57.     Following enrollment, physicians and other health care providers who provide services to Medicare beneficiaries submit to the appropriate Medicare fiscal intermediary a claim for reimbursement through a CMS 1500 or 837P. Regulations adopted by CMS require that a provider's services and procedures must be entered onto a CMS 1500 or 837P by using CPT codes. *See* 45 C.F.R. § 162.1002. Providers submit these claims for reimbursement by mail or electronically pursuant to an "Electronic Data Interchange (EDI) Enrollment Form" ("EDI Form") and other documents signed by the provider.

58.     At all times material to this action, Defendants submitted, or caused to be submitted, Forms CMS 1500 or 837P by one or both of these methods.

59.     Pursuant to the EDI Form, the provider, among other things, (a) certifies that it will submit claims that are accurate, complete, and truthful; (b) agrees that all claims are claims for payment under the Medicare program that will be paid from federal funds; and (c) agrees that falsifying or misrepresenting (or causing the falsification or misrepresentation of) any record or information relating to such claims violates applicable federal law. In addition, the electronic claims themselves contain a certification of accuracy and veracity. At all relevant times, Defendants (except R1) had entered and were obligated by such an agreement.

60.     Medicare relies upon provider certifications in paying claims for services.

61.     Similarly, when enrolling to submit claims electronically, providers certify that they "will submit claims that are accurate, complete, and truthful."

62.     A participating provider must properly document in the patient's medical record the service or procedure performed. *See* 42 C.F.R. § 431.107(b)(1).

63.     Health care providers are prohibited from knowingly presenting or causing to be presented claims for items or services that the person (a) knew or should have known were not medically necessary or (b) knew or should have known were false or fraudulent. *See* 42 U.S.C. §§ 1320a-7a(a)(1); 1320a-7(b)(7) (permitting exclusion of providers for the foregoing violations).

64.     A provider has a duty to familiarize itself with the statutes, regulations, and guidelines regarding coverage for the Medicare services it provides. *Heckler v. Cmty. Health Servs. of Crawford Cty.*, Inc., 467 U.S. 51, 64 (1984).

65.     Because it is not feasible for the Medicare program, or its contractors, to review

medical records corresponding to each of the millions of claims for payment it receives from providers, the program relies on providers to comply with Medicare requirements and to submit truthful and accurate certifications and claims.

66.    Generally, once a provider submits a CMS 1500 or the electronic equivalent to the Medicare program, the claim is paid directly to the provider, in reliance on the foregoing certifications, without any review of supporting documentation, including medical records.

67.    Using electronic and other means, Defendants routinely and knowingly submitted false claims, or caused false claims to be submitted, to the United States because Defendants knowingly billed Medicare or knowingly caused Medicare to be billed for services that were up-coded and, thus, did not meet Medicare requirements such as the medical necessity requirement.

**B.    Medicaid**

68.    In 1965, Congress established the Grants to States for Medical Assistance Programs under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396w-2 ("Medicaid"). Medicaid provides medical and health-related assistance for the neediest and most vulnerable individuals. Those eligible for Medicaid include pregnant women, children, and persons who are blind or suffer from other disabilities and who cannot afford the cost of health care. *Id*. § 1396d.

69.    Medicaid is a joint federal-state health care program. 42 U.S.C. § 1396b. If a state elects to participate in the program, the costs of Medicaid are shared between the state and the federal government. *Id*. § 1396a(a)(2). In order to receive federal funding, a participating state must comply with requirements imposed by the Act and regulations promulgated thereunder.

70.    Medicaid is administered at the federal level by the Secretary of HHS through CMS, which promulgates regulations—including minimum coverage parameters. Each state has

its own Medicaid agency, which is responsible for developing CMS-approved programs, setting its own guidelines regarding eligibility and services, and administering claims.

71.     The federal portion of Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on a state's per capita income compared to the national average. 42 U.S.C. § 1396d(b). As a result, the federal matching funds range from approximately 50% to 75%. In FCA actions, the practical effect of Medicaid's dual funding mechanism is that the FCA will recover the FMAP of each affected claim submitted in any state or territory.

72.     To qualify for these federal matching funds, each state Medicaid program must submit a plan to the Secretary of HHS for approval. *See* 42 C.F.R. § 430 Subpart B and § 488.303.

73.     Utah participates in the Medicaid program pursuant to Utah Code Ann. § 26-18¬2(4). The federal government, through CMS, provides approximately 65% of the funds used by the Utah Medicaid program to provide medical assistance to persons enrolled in the Medicaid program. In return for receipt of federal subsidies, Utah is required to administer its Medicaid program in conformity with a state plan that satisfies the requirements of the Act and accompanying regulations. *See* 42 U.S.C. §§ 1396-1396w.

74.     The administration and payment of claims submitted by providers is handled by each state Medicaid program, which then submits claims information to the federal government in order to obtain the requisite FMAP. As a result, each claim for payment submitted to Medicaid is both a "claim" for payment submitted directly to the relevant state and a "claim" for payment submitted indirectly to the United States.

75.     Medicaid's general coverage parameters exclude items that are not "medically necessary" or provided economically (i.e., "reasonable and necessary" from a fiscal perspective).

*See* 42 U.S.C. § 1320c-5(a)(1) (goods and services must be "provided economically and only when, and to the extent, medically necessary"); 42 C.F.R. § 1004.10(a) (same); Utah Admin. Code R414-1-2 ("medically necessary service" means that "(a) it is reasonably calculated to prevent, diagnose, or cure conditions in the recipient that endanger life, cause suffering or pain, cause physical deformity or malfunction, or threaten to cause a handicap; and (b) there is no other equally effective course of treatment available or suitable for the recipient requesting the service that is more conservative or substantially less costly").

### C.    TRICARE

76.    TRICARE is a medical benefits program established by federal law. *See* 10 U.S.C. §§ 1071-1110b. TRICARE covers eligible beneficiaries, which include active duty members of the Uniformed Services and their dependents as well as retired members of the Uniformed Services and their dependents. The federal government reimburses a portion of the cost of health care services and prescription medications provided to TRICARE beneficiaries. TRICARE is administered by the Defense Health Agency.

77.    TRICARE covers only medically necessary inpatient and outpatient care. TRICARE defines medically necessary care as services or supplies provided by a hospital, physician, and/or other provider for the prevention, diagnosis, and treatment of an illness, when those services or supplies are determined to be consistent with the condition, illness, or injury; provided in accordance with approved and generally accepted medical or surgical practice; not primarily for the convenience of the patient, the physician, or other providers; and not exceeding (in duration or intensity) the level of care which is needed to provide safe, adequate, and appropriate diagnosis and treatments. *See* 32 C.F.R. § 199.4(a)(1)(i) and applicable definitions at

32 C.F.R. § 199.2. TRICARE regulations defining "medical necessity" also require that services and supplies be "furnished economically." 32 C.F.R. § 199.4(a)(1)(i).

78.    TRICARE does not pay for services that are not authorized by law or that are fraudulently billed. *See* 32 C.F.R. § 199.7(i)(3).

79.    TRICARE regulations also provide that TRICARE may deny payment in "abuse situations." *See* 32 C.F.R. § 199.9(b). To avoid abuse situations, providers are obligated to provide services and supplies under TRICARE that are: "Furnished at the appropriate level and only when and to the extent medically necessary . . .; of a quality that meets professionally recognized standards of health care; and, supported by adequate medical documentation as may reasonably be required under this part . . . to evidence the medical necessity and quality of services furnished, as well as the appropriateness of the level of care." *Id*. TRICARE has specified examples of fraud or abuse against the TRICARE program as including "[m]isrepresentations of . . . description of services rendered." *Id*. § 199.9(c).

80.    TRICARE regulations further define "appropriate" medical care as that which is, among other things, "[f]urnished economically"—i.e., "in the least expensive level of care or medical environment adequate to provide the required medical care." 32 C.F.R. § 199.2.

81.    In addition, TRICARE requires maintenance of appropriate medical records to substantiate that billed services were actually rendered. *Id*. § 199.7(b)(3). Failure to document the care billed will result in denial of payment by TRICARE. *Id*.; TRICARE Policy Manual 6010.60-M, Ch. 1, § 5.1, ¶ 3.2.

82.    As with Medicare, providers submit claims to TRICARE using the CMS 1500 or an electronic equivalent. Providers therefore make the same certifications in submitting claims to

TRICARE as they do when submitting claims to Medicare. Because it is not feasible for TRICARE, or its contractors, to review medical records corresponding to each of the claims for payment it receives from providers, the program relies on providers to comply with TRICARE requirements and relies on providers to submit truthful and accurate certifications and claims.

### D.    Veterans Administration Health Benefits Programs

83.    The United States offers medical benefits to qualified veterans. *See* 38 U.S.C. § 1701; 38 C.F.R. § 17.38(a). Specifically, the Veterans Administration ("VA"), through the Veterans Health Administration, provides and pays for inpatient and outpatient health care services for veterans and their dependents and survivors.

84.    VA cover medical services only if "it is determined by appropriate healthcare professionals that the care is needed to promote, preserve, or restore the health of the individual and is in accord with generally accepted standards of medical practice." 38 C.F.R. § 17.38(b).

85.    Beginning in August 2014, Congress enacted the Veterans Access, Choice, and Accountability Act of 2014 to enable eligible veterans to obtain medical care outside of the VA medical system from providers in their communities. Through this statute, veterans may enroll in the Veterans Choice Program ("Choice"), which provides primary care, inpatient and outpatient specialty care, and mental health care for eligible veterans when the local VA health care facility cannot provide the services for certain specified reasons, such as lack of available specialists, long wait times, or extraordinary distance from the veteran's home.

86.    Congress also required the VA to develop a plan to consolidate all non-VA community care programs under Choice. The plan was required to address a number of elements, including "the structuring of the billing and reimbursement process, including the use of third-

party medical claims adjudicators or technology that supports automatic adjudication." Choice claims are processed on behalf of VA by third-party administrators ("TPAs"), which include TriWest Healthcare Alliance ("TriWest"). The services provided by the TPAs are governed by contracts between each TPA and the VA (the "TPA contracts") and include building provider networks, scheduling appointments, collecting medical documentation, and making payments for medical care.

87.    Verification of eligibility in the form of an authorization from the TPA is required for reimbursement of costs associated with care provided to a veteran. Once the provider is enrolled or credentialed, the provider may submit bills to the Government Healthcare Programs for services rendered to the patients. The TPA contracts require the providers of medical treatment to send their invoices to the TPAs, which must pay the providers and then bill the VA for these medical services.

88.    VA and Choice only pay for covered services and supplies that are "medically determined to be reasonable and necessary." 38 C.F.R. § 17.30(a)(1).

### E.    The Federal Employee Health Care Programs

89.    The U.S. Office of Personnel Management ("OPM") enters into contracts with qualified carriers to offer health insurance plans to federal employees. *See* 5 U.S.C. § 8902. Separate funds are established to cover current employees, their families, and survivors (5 U.S.C. § 8909) and to cover postal service retirees, their families, and survivors (5 U.S.C. § 8909a).

90.    To guard the federal fisc against fraud, waste, and abuse, Congress explicitly authorizes the OPM, acting through the Attorney General, to bring a civil action to recover a civil monetary penalty of not more $10,000 and an assessment of not more than twice the amount claimed from a health care provider who "knowingly made, or caused to be made, any false

statement or misrepresentation of a material fact which is reflected in a claim presented under this chapter." 5 U.S.C. §§ 8902a(d)(2) and 8902a(i).

## VI.    BILLING FOR PHYSICIAN EMERGENCY ROOM SERVICES

91.    The amount of money a medical provider is paid for his or her services by Government Healthcare Programs depends on which CPT codes are used.

92.    The Medicare program requires physician providers to bill Medicare Part B services using CPT codes to describe the procedures and services provided. *See* 45 C.F.R. § 162.1002; Medicare Claims Processing Manual, Ch. 12, § 30.

93.    CPT codes determine both coverage (*i.e.*, if Medicare will pay for the billed medical procedures and services) and the reimbursement amount (*i.e.*, how much Medicare will pay for the billed medical procedures and services).

94.    For all CPT codes, the medically necessary service and the procedure must be appropriately and sufficiently documented by the physician or qualified non-physician practitioner in the patient's medical record to support the claim for these services. *See* Medicare Claims Processing Manual, Chap. 12 at § 30.6.6(B).

95.    The statutory prohibition against Medicare reimbursement for services and procedures that are not "medically necessary" or "reasonable and necessary" includes levels of a physician's evaluation and management services. 42 U.S.C. § 1395y(a)(l)(A).

### A.    CPT Codes 99281-99285

96.    For patients seen in the emergency department of a hospital, ER E&M services are billed using a five-level series of CPT codes (CPT codes 99281 through 99285). In addition, there are varying levels of complexity assigned to the patient's visit from level 1 to level 5, with level 1

being the lowest and level 5 being the highest.

97.    The applicable ER E&M code level of service is defined by, most importantly, the severity and urgency of the presenting medical problem, i.e., the chief complaint.

98.    Under Intermountain's own coding guidance, "the overarching criterion" for ER E&M "coding is medical necessity," and "it is not "medically necessary or appropriate to bill for a higher level of [ER E&M] service when a lower level of service is warranted." *See* Ex. 4 at 1. Thus, as a patient's medical condition became more severe and urgent, the code number increases, with 99281 as the lowest level and 99285 as the highest level.[6]

99.    Time is not a descriptive component for the emergency department levels of ER E&M services because ER services are typically provided on a variable intensity basis, often involving multiple encounters with several patients over an extended period of time. Therefore, it is often difficult to provide accurate estimates of the time spent face-to-face with the patient.

### 1.    CPT Code 99281

100.    CPT code 99281 is used to bill for an ER visit where the presenting problems are self-limited or minor. "Self-limited or minor" means a problem that runs a definite and prescribed course, is transient, and is not likely to permanently alter the patient's health status or has a good prognosis with management/compliance.

101.    Examples of emergency department visits that supported the proper use of CPT code 99281 include the following:

- removal of sutures from a well-healed, uncomplicated laceration;

---

[6]    During the relevant period, *i.e.*, 2015 to 2022, the level of history, the level of examination, and the complexity of the medical decision making also could affect the coding.

- tetanus toxoid immunization; and

- several uncomplicated insect bites.[7]

### 2.    CPT Code 99282

102.    CPT code 99282 is used to bill for an ER visit where the presenting problems are of low to moderate severity. "Low severity" means a problem where the risk of morbidity without treatment is low, there is little to no risk of mortality without treatment, and full recovery without functional impairment is expected.

103.    "Moderate severity" means a problem where the risk of morbidity without treatment is moderate, there is moderate risk of mortality without treatment, there is uncertain prognosis, or there is increased probability of prolonged functional impairment.

104.    Examples of emergency department visits that supported the proper use of CPT code 99282 include the following:

- a 20-year-old student who presents with a painful sunburn with blister formation on the back;

- a minor traumatic injury of an extremity with localized pain, swelling, and bruising;

- an otherwise healthy patient whose chief complaint is a red, swollen cystic lesion on his or her back;

- a patient presenting with a rash on both legs after exposure to poison ivy;

- a young adult patient with infected sclera and purulent discharge from both eyes without pain, visual disturbance or history of foreign body in either eye; and

---

[7]    During the relevant period, *i.e.*, 2015 to 2022, CPT code 99281 also required three key components: (1) a problem-focused history; (2) a problem-focused examination; and (3) straightforward medical decision-making.

- a child presenting with impetigo localized to the face.[8]

### 3. CPT Code 99283

105.    CPT codes 99283-99285 are used when patient's medical condition are more severe and urgent and the examination and medical decision are more in-depth and more complex.

106.    CPT code 99283 is used to bill for an ER visit where the presenting problems are of moderate severity. "Moderate severity" means a problem where the risk of morbidity without treatment is moderate, there is moderate risk of mortality without treatment, there is uncertain prognosis, or there is increased probability of prolonged functional impairment.

107.    Examples of emergency department visits that supported the proper use of CPT code 99283 include the following:

- a well-appearing eight-year-old who has a fever, diarrhea, and abdominal cramps, is tolerating oral fluids, and is not vomiting;

- a patient with an inversion ankle injury, who is unable to bear weight on the injured foot and ankle;

- a patient who has a complaint of acute pain associated with a suspected foreign body in the painful eye;

- a healthy, young adult patient who sustained a blunt head injury with local swelling and bruising without subsequent confusion, loss of consciousness or memory deficit; and

- a sexually active female complaining of vaginal discharge who is afebrile and denies experiencing abdominal or back pain.[9]

---

[8]    During the relevant period, *i.e.*, 2015 to 2022, CPT code 99282 also required three key components: (1) an expanded problem-focused history; (2) an expanded problem-focused examination; and (3) medical decision-making of low complexity.

[9]    During the relevant period, *i.e.*, 2015 to 2022, CPT code 99283 also required three key components: (1) an expanded problem-focused history; (2) an expanded problem-focused examination; and (3) medical decision-making of moderate complexity.

### 4.    CPT Code 99284

108.    CPT code 99283 is used to bill for an ER visit where the presenting problems are of high severity and require urgent evaluation by a physician or other qualified health care professionals but do not pose an immediate significant threat to life or physiologic function.

109.    Examples of emergency department visits that support the proper use of CPT code 99284 include the following:

- an elderly female who has fallen and is now complaining of pain in her right hip and is unable to walk;

- a patient with flank pain and hematuria;

- a female presenting with lower abdominal pain and a vaginal discharge; and

- a four-year-old who fell off a bike sustaining a head injury with brief loss of consciousness.[10]

### 5.    CPT Code 99285

110.    CPT code 99285 is used to bill for an ER visit where the presenting problems are of high severity and pose an immediate significant threat to life or physiologic function.

111.    The term "high severity" means a problem where the risk of morbidity without treatment is high to extreme, there is a moderate to high risk of death without treatment, or there is a high probability of severe, prolonged functional impairment.

112.    Examples of emergency department visits that support the proper use of CPT code 99285 include the following:

---

[10]    During the relevant period, *i.e.*, 2015 to 2022, CPT code 99284 also required three key components: (1) a detailed history; (2) a detailed examination; and (3) medical decision-making of moderate complexity.

- a patient with a complicated overdose requiring aggressive management to prevent side effects from the ingested materials;

- a patient exhibiting active, upper gastrointestinal bleeding;

- a previously healthy young adult patient who is injured in an automobile accident and is brought to the emergency department, immobilized, and has symptoms compatible with intra-abdominal injuries or multiple extremity injuries;

- a patient with an acute onset of chest pain compatible with symptoms of cardiac ischemia and/or pulmonary embolus;

- a patient who presents with a sudden onset of "the worst headache of her life" and complains of a stiff neck, nausea, and inability to concentrate;

- acute febrile illness in an adult, associated with shortness of breath and an altered level of alertness;

- a patient with a new onset of rapid heart rate requiring IV drugs; and

- a patient with a new onset of a cerebral vascular accident.

113.    According to Intermountain's own ER E&M coding guidance, while both CPT codes 99284 and 99285 require patients to present with "high severity" conditions, the use of CPT code 99285 is proper only if "there is ***an immediate, significant threat*** to a life or bodily function." *See* Ex. 4 at 2 (emphasis added). For example, as Intermountain recognized, "it would be inappropriate to bill all encounters that have a chief complaint of chest pain with the highest level of service [*i.e.*, CPT code 99285], unless it is evident that the current presentation truly posed a threat to life or bodily function." *Id*. at 3.

114.    To properly code and bill the highest level of emergency department codes (99285), the visit must be medically necessary and must not be based on the volume of documentation alone. Chapter 12 of the Medicare Claims Processing Manual states:

> Medical necessity of a service is the overarching criterion for payment

> in addition to the individual requirements of a CPT code. It would not be medically necessary or appropriate to bill a higher level of evaluation and management service when a lower level of service is warranted. The volume of documentation should not be the primary influence upon which a specific level of service is billed.

Medicare Claims Processing Manual, Ch. 12, § 30.6.1.[11]

### B.     Medicare Reimbursement Rates for Levels of ER E&M Services

115.    At all relevant times, CMS has used the Relative Value Unit ("RVU") system to calculate Medicare reimbursement for physician services like ER E&M services. For each CPT code payable by Medicare, CMS assigned an RVU and uses that value to determine the appropriate reimbursement rate. More complex or intense types of services are assigned higher RVUs. As a result, they are paid at higher rates by Medicare.

116.    As relevant here, CMS has assigned significantly higher RVUs to level 5 ER E&M services as compared to level 4 and level 3 services. In 2020, for example, the RVUs assigned to different levels of E&M services were:

| ER E&M Service Level | CPT Code | RVU |
|:---:|:---:|:---:|
| 1 | 99281 | 0.48 |
| 2 | 99281 | 0.93 |
| 3 | 99281 | 1.42 |
| 4 | 99281 | 2.60 |
| 5 | 99281 | 3.80 |

---

[11]    During the relevant period, *i.e.*, 2015 to 2022, CPT code 99285 also required three key components within the constraints imposed by the urgency of the patient's clinical condition[11] and/or mental status: (1) a comprehensive history; (2) a comprehensive examination; and (3) medical decision-making of high complexity.

117.    In short, Medicare paid 45% more for level 5 ER E&M services as compared to level 4 services and almost three times as much as compared to level 3 services. Indeed, the stark difference between Medicare's and Medicaid's reimbursement rates for CPT codes 99825 and 99823 is illustrated by the excerpt below from Intermountain's internal analysis from 2020:

**Payment Rates**

| Medicaid | | | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|
| 99285 | | | $ 128.16 | $ 128.16 | $ 133.17 | $ 132.91 | $ 133.20 |
| 99283 | | | $ 45.67 | $ 47.62 | $ 47.49 | $ 47.51 | $ 47.60 |
| DIFF | | | $ 82.49 | $ 80.54 | $ 85.68 | $ 85.40 | $ 85.60 |

| Medicare | | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|
| 99285 | $ | 166.40 | $ 166.40 | $ 166.40 | $ 175.46 | $ 175.93 | $ 176.09 | $ 176.37 |
| 99283 | $ | 59.31 | $ 59.31 | $ 59.31 | $ 62.57 | $ 62.74 | $ 62.95 | $ 63.02 |
| DIFF | $ | 107.09 | $ 107.09 | $ 107.09 | $ 112.89 | $ 113.19 | $ 113.14 | $ 113.35 |

## VII.    THE GOVERNMENT HAS CONSISTENTLY ENFORCED REQUIREMENTS FOR CORRECT CODING OF ER E&M SERVICES

118.    Since at least 1990s, the Government has consistently highlighted the importance of correct coding and billing of ER E&M services by Medicare and Medicaid providers.

119.    These efforts have included written guidance and training for providers as well as audits and other enforcement activities when providers fail to comply with the coding and billing requirements — especially for level 5 E&M services billed with CPT code 99285.

120.    For example, CMS and Medicare claim-processing contractors have regularly issued written guidance about E&M service coding requirements to remind providers of their compliance obligations. In May 2011, for example, Noridian, a Medicare claim-processing contractor, issued a newsletter that discussed, among other things, correct coding for E&M services. Similarly, in 2013, CGS, another Medicare claim-processing contractor, published written guidance and offered training on the use of "CPT Code 99285."

121.    Starting since at least the 1990s, Medicare also has regularly conducted audits of ER billing practices. In 1992, for example, Medicare conducted an audit of billing for ER services in Oregon and issued directions to providers who billed improperly. *See U.S. ex rel. Trim v. McKean*, 31 F. Supp. 2d 1308, 1313 (W.D. Okla. 1998).

122.    Further, in 2014, as Intermountain's own internal records show, Medicare undertook an extensive series of audits of level 5 E&M billing across 10 different states. *See* Ex. 1 at 1 (summarizing the findings of the 2014 Medicare audits).

123.    Since 2021, moreover, the HHS Office of Inspector General has engaged in an ongoing audit of "Medicare Emergency Department Evaluation and Management Services," which is expected to be completed in 2025.[12]

124.    In addition, when the Government became aware that providers were repeatedly engaging in incorrect billing for level 5 E&M services, the Government has repeatedly taken enforcement action to recover the losses caused by such fraudulent billing.

125.    In June 1998, for example, the Government pursued a bench trial in an FCA case against a physician, J.D. McKean, and his medical practice for repeatedly and fraudulently billing for ER E&M services. *See McKean*, 31 F. Supp. 2d at 1310. Following that bench trial, the district court found that the Government was "entitled to recover under the FCA for the false claims[.]" *Id*. at 1316.

126.    In 2002, moreover, the Government intervened in a *qui tam* action based on allegations that a neurology practice had "upcoded almost every [E&M] claim to Levels IV and V

---

[12]    *See* https://oig.hhs.gov/reports-and-publications/workplan/summary/wp-summary-0000612.asp.

when the actual level of services they provided was much lower." *U.S. ex rel. Harris v. Bernad*, 275 F. Supp. 2d 1 (D.D.C. 2003) (denying defendants' motion to dismiss).

127.    In recent years, the Government has continued to pursue enforcement actions in response to widespread upcoding of emergency room E&M services. In November 2024, for example, the Government obtained a $23 million settlement from the University of Colorado Healthcare system for an alleged practice of "automatically coding certain ER visits using CPT 99825" irrespective of the actual severity of the patients' medical conditions.[13]

128.    In this action, the Government likewise obtained an over $3 million partial settlement from Intermountain in 2024 based on Relator's claims concerning the alleged upcoding of ER E&M services at the Cassia and McKay hospitals.

## VIII.    DEFENDANTS' VIOLATIONS OF THE FCA

### A.    Defendants' Awareness of Medicare's and Other Government Healthcare Programs' Requirements to Properly Code ER E&M Services

129.    At all relevant times, each Defendant was aware of both the coding standards for billing ER E&M services—especially for level 5 E&M services using CPT code 99285—and their own obligations to code and bill for such services accurately.

130.    To start, Medicare and other government healthcare programs had widely publicized the coding requirements ER E&M services through training, written guidance, and audits. As summarized above, Noridian and CGS issued written guidance to providers about proper coding and billing for E&M services in 2011 and 2013, respectively. In 2014, Medicare also

---

[13]    *See* https://www.justice.gov/archives/opa/media/1376721/dl (last visited September 1, 2025).

conducted a series of audits of the use of CPT code 99285 in multiple states to ensure that hospitals were coding and billing for ER E&M services properly.

131.    As Medicare service providers and billing providers, Defendants had an obligation to familiarize themselves with those training, guidance, and audit findings. They also certified to Medicare their familiarity with the coding requirements for procedures like ER E&M services.

132.    By late 2014 and 2015, Intermountain was aware of Medicare's scrutiny of hospitals' improper use of CPT code 99285. Specifically, according to a November 2014 internal email, Medicare, through Noridian, conducted a wide-ranging audit of ER E&M services at 16 Intermountain facilities, including eight of its larger hospitals:

**From:** Arthur Petersen
**Sent:** Thursday, November 20, 2014 2:24 PM
**To:** Todd Allen; Nancy Nelson
**Subject:** RE: Noridian Review of Physician Level 5 E/M CPT 99285

Todd and Nancy, here is the update for the 16 Intermountain facilities (only 8 larger facilities were audited) that are "billing" the ED Physician 99285 codes (Level 5 E/M).

133.    Even before Noridian completed its audit, Intermountain knew—as this November 2014 email shows—that it had a serious upcoding problem throughout its hospital system due to "error rates this high!" Specifically, 24 of the first 40 level 5 ER E&M services audited by Noridian were "downcoded," which translated to a 60% error rate. Those findings, moreover, were not isolated to a specific hospital or a particular ER physician provider, but rather involved nearly all the hospitals under audit as well as UEP, SWEP, and other providers.

Attached spreadsheet has acct#s and actual comments as to why they were down coded.
- I think we will want our expert physician coders to review these before deciding whether or not to appeal, and take corrective action.
- The biggest risk we face is 100% prepayment review with error rates this high!
- If these error rates held true for high volumes the dollar impact would be much larger.

| Facility | #of Reviews | #withResults | #Downcoded | %Downcoded | Group |
|---|---|---|---|---|---|
| 116 | 4 | 2 | 2 | 100% | UEP |
| 126 | 35 | 6 | 3 | 50% | SWEP |
| 128 | 8 | 1 | 0 | 0% | UEP |
| 132 | 13 | 12 | 8 | 67% | UEP |
| 139 | 3 | 1 | 1 | 100% | UEP |
| | | | | | Mixed |
| 143 | 4 | 4 | 2 | 50% | Other |
| 146 | 18 | 4 | 1 | 25% | SWE |
| 154 | 11 | 10 | 7 | 70% | UEP |
| **Grand Total** | **96** | **40** | **24** | **60%** | |

| Down coded to | Count of ACCOUNT | Sum of Payment Diff |
|---|---|---|
| 99282 | 3 | $ 394.98 |
| 99283 | 4 | $ 445.32 |
| 99284 | 17 | $ 939.25 |
| **Grand Total** | **24** | **$ 1,779.55** |

## B. Defendants' Awareness of Widespread Upcoding of ER E&M Services Across the Intermountain Hospital System

134. As Noridian's audit of level 5 ER E&M services at Intermountain hospitals progressed, it uncovered more cases of upcoding. As an internal summary prepared by Intermountain shows, Noridian audited a total of 148 ER E&M services billed at level 5 with CPT code 99285, and "103", *i.e.*, "70%" were "[d]own-coded by Noridian" as having been improperly billed. *See* Ex. 1 at 1.

135. Even before the conclusion of Noridian's audit, moreover, Intermountain, UEP, and SWEP met regularly to discuss the audit findings. On May 5, 2015, for example, Intermountain, UEP, and SWEP staff met by WebEx to discuss potential "Noridian 99285 Appeal[.]"

136. According to internal emails, the Professional Coding and Reimbursement department ("PCR") at Intermountain—which was later known as the Professional Documentation and Coding department or PDC—initially agreed with 49% of the upcoding findings by Noridian.

**From:** Arthur Petersen
**Sent:** Thursday, January 28, 2016 3:15 PM

In prep for our discussion tomorrow here is an agenda with some references.

1.  Arthur: Quick summary of Noridian Audit of ED Physician 99285 (Level 5 E/M)

|  |  |  |  |
|---|---|---|---|
| | 148 | | Total Audited by Noridian |
| | 103 | 70% | Down-coded by Noridian |
| 47 | 49% | PCR agreed with Noridian i.e. NOT Level 5 (Out of 95 Reviewed by PCR) | |

137.    Nonetheless, Intermountain, UEP, and SWEP decided to appeal 79 of the upcoding findings by Noridian.  "100% of those were denied" at the first level of review.  *See* Ex. 1 at 1.

138.    Intermountain, UEP, and SWEP then selected 10 of those 79 claims, which "were agreed to have the strongest arguments" on appeal, to appeal "to the second level (5 for UEP and 5 for SWEP)." *Id*. Eight of those second-level appeals were again denied. *See id*.

139.    Put simply, by 2016, Intermountain and its physician and billing providers were aware of two basic facts regarding the coding and billing of ER E&M services at Intermountain hospitals—*first*, there was a pervasive failure across the hospital system to follow existing internal coding and billing standards for level 5 E&M services; *second*, the internal coding and billing standards did not comply with Medicare's requirements.

140.    Indeed, a compliance executive at Intermountain emphasized in an internal email on January 29, 2016, the need to clarify both its "coding standard [] regarding level 5 ED [emergency department] E&M codes" and its "risk level in regards to the level 5 coding."[14]

---

[14]    Tricia Hansen, the author of this email, was a compliance director at Intermountain in 2016.

**From:** Tricia Hansen
**Sent:** Friday, January 29, 2016 7:54 AM
**To:** Arthur Petersen <Arthur.Petersen@imail.org>;

Thanks Arthur.

Regarding the agenda  I would like to remove the discussion/reference to the decision rights document, and although I like the idea of the updates regarding the current appeal status, I would like to primarily focus on two things. 1) Agreement from this group about what the coding standard at Intermountain is regarding level 5 ED E&M codes, and 2) Agreement about IH's risk level in regards to the level 5 coding.

141.    Defendants' awareness of the coding and billing requirements for level 5 E&M services also can be seen from their internal policies and procedures.

142.    During the relevant times, for example, Intermountain maintained a written policy on the "Medical Necessity Requirement for Evaluation and Management Services." *See* Ex. 5. As this policy recognized, "[a]ll payers have as an underlying policy that only medically necessary services are covered," and this "includes the level of service for any visit[.]" *Id*. at 1;

143.    Intermountain also maintained an internal coding department—initially known as PCR and then as PDC—that had knowledge and experience with applicable coding standards, especially the coding standard for level 5 E&M services. As noted above, PDC developed a set of internal guidance on proper coding for ER E&M services, which, as relevant here, recognized that (A) "*medical necessity* must be the driving factor behind any selection of [ER E&M] charges"; and (B) "it would be inappropriate to bill … at the highest level of service, unless it is evident that the current presentation truly posed a threat to life or bodily function." *See* Ex. 4 at 4, 3 (emphasis in original).

144.    Further, when it deemed it absolutely necessary, Intermountain was able to utilize

its internal coding staff to conduct internal audits of the ER E&M services coded and billed as level 5 with CPT code 99285. *See*, *e.g.*, Ex. 1 at 2 (an internal audit conducted in 2016 found "approximately 50%" error rate).

### C. Upcoding of ER E&M Services to Level 5 Continued to Be Pervasive and Persistent at Intermountain Hospitals After the Noridian Audit

145.    Despite Defendants' knowledge of their obligations to comply with the coding requirements for level 5 E&M services, and despite their awareness of deficiencies in their coding practices as revealed by the 2014 Medicare audit across 16 Intermountain hospitals, Defendants wholly failed to make meaningful changes to ensure compliance with the correct coding requirements and their obligations to Medicare and other government healthcare programs.

146.    According to a May 2016 Intermountain internal update, for example, PCR (*i.e.*, Intermountain's coding department) conducted a "probe audit" of "more recent encounters coded as a level 5 by UEP." Ex. 1 at 2.

147.    This audit "found the error rate to ***continue at approximately 50%***." *Id.* (emphasis added). In other words, approximately 18 months after the 2014 Medicare audit, Intermountain and UEP had not changed their practices with respect to correctly coding and billing for E&M services as level 5.

148.    Defendants also failed to make meaningful changes to their level 5 E&M service coding practices between 2016 and 2020.In October 2018, for example, OptumCare Utah, which conducts utilization review for Medicare Part C plans, notified Intermountain that "a claims review" had found that providers at Intermountain and RMES were "'outliers' on the submission of claims" for ER E&M services with "CPT 99285[.]" *See* Ex. 2.

149.    Specifically, Optum found that "your billing office is an **outlier compared to national and State Utah Medicaid program[]** regarding the coding of Emergency Department E&M services." *Id*. (emphasis added).

150.    Similarly, in December 2019, when Intermountain's PDC conducted an in-depth audit of E&M services coded and billed as level 5 at Cassia and McKay in December 2019, it found almost improper coding at almost exactly the same level (70%) as the 2014 Medicare audit—the "statistically valid error rate" for "Code 99285" was 72% at Cassia and 69% at McKay:

**Background:**

The Professional Documentation and Coding department (PDC) recently completed an audit of Cassia and McKay Emergency Department E/M levels (99281-99285). The audit revealed risk for Cassia encompassing dates of services between 5/1/2014 – 6/30/2017 (the period of time where Cassia ED coding was outsourced to McKesson), and for McKay encompassing dates of service between 11/30/2013 – 11/30/2019.

Statistically Valid Audit results:

| Facility | Risk Issue | Statistically Valid Error Rate | Estimated Extrapolated Financial Impact Utilizing Statistically Valid Error Rate, 16% APP Utilization Rate (Cassia Only) & 15% Reduction for Re-Billing Under APP (Cassia Only) (Also Includes corrections for Statistically Valid Encounters) |
|---|---|---|---|
| Cassia ED | High Levels (Affected Code 99285) | 102/141 = 72% | $ 201,787.34 |
| | Shared Services (Affected Codes 99281 - 99285) | APP Utilization Rate 49/297 = 16% Error Rate When APP was Utilized 47/49 = 96% | |
| McKay ED | High Levels (Affected Code 99285) | 268/388 = 69% | $ 2,936,864.26 |

151.    Moreover, those persistently high levels of "statistically significant error rate[s]" were not isolated to just Cassia and McKay. As Kerry Gillespie, a former divisional CFO at Intermountain, admitted in an internal email on December 17, 2019, "the exposure at McKay demonstrates potential exposure in the Salt Lake Valley facilities."

**From:** Kerry Gillespie <Kerry.Gillespie@imail.org>
**Sent:** Tuesday, December 17, 2019 3:43 PM
**To:** Tricia Hansen <Tricia.Hansen@imail.org>
**Subject:** RE: McKay & Cassia ED Financial Estimates

Tricia, we need to have a pow-wow on this with Suzie and Mark Runyon. My problem is the exposure at McKay demonstrates potential exposure in the Salt Lake Valley facilities, and I want to make sure we are all on the same page before we move ahead. I am out on vacation starting this Friday through the 6th and have a meeting with the other CFO's at 2 pm on the 7th, I suggest we take time either before or after that meeting to flesh this out and identify the process to move forward. Mark, I will try to get with you this week to explain this issue so you'll be up to speed.

152.    The "Salt Lake Valley facilities" referenced in Mr. Gillespie's email include several of largest hospitals within the Intermountain system such as the Intermountain Medical Center and the LDS Hospital that were, like McKay, staffed by ER physicians provided by UEP.

153.    Internal records also reveal how Intermountain, the physician groups that supply ER doctors like UEP, as well as R1 refused to rectify the persistent and pervasive upcoding practice across the Intermountain hospital system.

154.    Specifically, Intermountain had a written "voluntary overpayment refund procedure" on "the process for returning overpayments to payers" like Medicare and Medicaid. *See* Ex. 3

155.    This procedure provided for "Probe Sample" audits, which involve "random sampling of 20-30 audit units" designed to "investigate allegations of overpayments." *Id*. at 1. When probe audits find error rates "in excess of 5%," this procedure called for "Discovery Sample Audits," which involve "random sampling of 50 audit units to provide voluntary refund statistics" to estimate overpayments. *Id*.

156.    Defendants, however, purposely disregarded this written procedure when it came to the upcoding of ER E&M services. Specifically, for level 5 E&M services, Intermountain routinely chose to ignore internal audits finding error rates well in excess of 5%.

157.     For example, a member of the PDC department at Intermountain stated an email

sent on June 23, 2020, that no further step would be taken in response to an internal audit of level

5 ER E&M services showing an error rate of *16.7%* where "if we only count those where the error

was more than one level off.

> **Subject:** RE: Cassia & McKay Stat Vals
>
> Based on my analysis, only one provider has an error rate above 20% if we only count
> those where the error was more than one level off.
>
> This was Ontiveros with 23.8%.
>
> The others were:
> McKay 99285 – 16.7%
> Hansen – 0%
> Kunz – 0%
> Campbell – 14.3%
> Haymore – 6.3%
> Pratt – 9.8%

158.     As an Intermountain compliance executive explained in a June 2020 internal email,

this is because Intermountain had a regular practice (A) to ignore all internal audit findings where

level 4 ER E&M services were upcoded to level 5; and (B) to avoid any detailed review when

internal audits showed "[a] provider's error rate [does not] *exceed[] 20%*."

> On Jun 24, 2020, at 1:48 PM, Tricia Hansen <Tricia.Hansen@imail.org> wrote:
>
> Suzie,
> What are your thoughts on the 20% error rate threshold? What PDC (Steve Sommer) is
> saying is that their general error rate philosophy is that if our error rate for a specific
> provider on a probe or statistically valid audit is less than 20% we don't extrapolate or
> audit all claims in the population. We would only correct the errors that were found.
> Steve confirms that philosophy was approved in CRC. I don't remember why, and I'm
> not sure we should apply that philosophy in this case anyway (we are already taking
> some risk by looking only a two level errors). Is this a decision that needs to go back to
> Kerry and Jeff?

159.    As Relator saw in 2020, the ultimate results of Intermountain's internal audit of ER E&M upcoding at the McKay Hospital underscored the recklessness of this approach. As the two preceding paragraphs show, when Intermountain initially ignored findings where level 4 ER E&M services were upcoded to level 5, it found error rates at McKay to be 16.7% and 23.8%. When Intermountain updated its results for McKay to include cases where ER E&M services were upcoded from 99824 to 99825 (*i.e.*, where the patients' conditions did not present immediate threats to life or bodily functions), the error rate jumped to 69%. *See supra* ¶ 151.

160.    In other words, Intermountain consciously or recklessly ignored internal audit findings showing that 40% or more of level 5 ER E&M services should have been billed to Medicare as level 4 services. Put simply, Intermountain and the other Defendants have consistently placed profits over compliance by making it a standard operating procedure to ignore clear red flags when it came to upcoding of level 5 ER E&M services.

**D.    Relator Confirmed the Duration, Frequency, and Pervasiveness of Upcoding of ER E&M Services Through His Independent Review**

**1.    Relator's Review of ER E&M Services at 10 Intermountain Hospitals**

161.    In August 2020, Relator undertook a review to determine how frequently Defendants up-coded ER E&M services across the Intermountain hospital system.

162.    Relator focused this review on the **10** Intermountain hospitals—Bear River Valley Hospital, Cassia, Cedar City Hospital, Delta Community Hospital, Dixie (now St. George) Regional Medical Center, Garfield Memorial Hospital, Heber Valley Hospital, Park City Hospital, Sampete Valley Hospital, and Sevier Valley Hospital—for which he had access to medical records.

163.    At those hospitals, Relator randomly selected a sample of approximately 100 encounters where patients received ER E&M services and where the services were coded and

billed as level 5, *i.e.*, with CPT code 99825, to Medicare, Medicaid, or other government healthcare programs.

164.    Utilizing his medical school training and his experience as a certified coder and a healthcare compliance professional, Relator reviewed the medical records to determine if they support level 5 coding with CPT code 99825. Based on his review, Relator determined that 52 of the approximately 100 level 5 service codes were not supported, not appropriate, and thus false.

165.    In other words, consistent with Intermountain's internal audit findings, Relator's analysis of this random sample of approximately 100 ER E&M services coded as level 5 showed a false billing rate of at least 50%.

### 2.    Representative Examples of False Claims Identified by Relator Due to Defendants' Practice of Upcoding ER E&M Services

166.    Below are representative examples of patients whose records show that Defendants falsely billed or caused to be billed Government Healthcare Programs for ER E&M services using CPT code 99285.[15] As the summaries show, none of these cases presented with conditions that evidenced an immediate "***threat to life or bodily function***," which, under Intermountain's own coding guidance, is a prerequisite for assigning CPT 99825. *See* Ex. 4 at 3 (emphasis added).

### a.    Patient W.P.

167.    Patient W.P., a Medicare beneficiary, was seen in the emergency department at Cassia Regional Hospital on September 3, 2016. Patient W.P. presented complaining of abdominal pain. The physician's documentation states that the "lab values came back as unremarkable." After

---

[15]    For privacy, HIPAA, and Protected Health Information ("PHI") reasons, Relator identifies patients by only their initials. Relator can and will provide additional identifiers for all patients referenced in this amended complaint upon request by Defendants or by order of the Court.

receiving some IV fluids and medications, the patient felt better. The physician advised the patient to increase fluid intake and sent the patient home in "stable condition." It was not appropriate, as Defendants did, to code and bill this visit using code 99285.

### b.    Patient R.J.

168.    Patient R.J., a Medicare and TRICARE beneficiary, presented at the emergency department at Park City Hospital shortly before midnight on February 11, 2018. Patient R.J. complained of abdominal pain. The physician's documentation states that "after drinking a vinegar honey concoction," the pain was "about a 5 or 6 out of 10. There is no radiation including no pain in the back. No chest pain, cough, or shortness of breath. . . . No fevers and no other complaints." The physician also stated: "Blood work is reassuring and the ultrasound shows cholecystitis. I think it's more inflammation than true infection at this time the Toradol he still comfortable his labs are reassuring." Patient R.J. was given some medications and sent home. It was not appropriate, as Defendants did, to code and bill this visit using code 99285.

### c.    Patient C.A.

169.    Patient C.A., a Medicare beneficiary, was seen in the emergency department at Bear River Valley Hospital on August 30, 2016. Patient C.A. complained of abdominal pain. The patient was diagnosed as having constipation. After IV fluids, medications, and an enema, the patient was given stool softener and sent home. It was not appropriate, as Defendants did, to code and bill for treating a constipated patient with no complications using code 99285.

170.    Not satisfied with one false billing for patient C.A., Defendants submitted or caused another one to be submitted less than two months later. On October 13, 2016, patient C.A. returned to the emergency department at Bear River Valley Hospital complaining again of abdominal pain.

The patient's final diagnosis was "generalized abdominal pain." After a diagnostic work-up, IV fluids, and medications, the patient was advised to take a stool softener and was sent home to clean out his bowels "as he did 2 months ago" (an obvious reference to his visit on just six weeks earlier as described in the preceding paragraph). And just as with patient C.A.'s first encounter, it was not appropriate, as Defendants did, to code and bill for treating a constipated patient with no complications using code 99285.[16]

### d.    Patient N.G.

171.    Patient N.G., a Medicare beneficiary, was seen in the emergency department at Cedar City Hospital on July 8, 2020. Patient N.G. was complaining of "abdominal pain." The physician's final diagnosis was "diverticulitis." The physician documented that "the patient was hydrated. Her nausea is controlled. Her pain is significantly better. ... The patient was instructed to push fluids" and was sent home. It was not appropriate, as Defendants did, to code and bill for treating a non-complicated episode of diverticulitis using code 99285.

### e.    Patient B.M.

172.    On February 16, 2018, patient B.M., a Medicare beneficiary, was seen at the emergency department at Park City Hospital complaining of "back pain." The physician's final diagnosis was "low back pain, possible [urinary tract infection] with hematuria and right flank pain." The patient was sent home with a prescription antibiotic for the possible urinary tract infection. It was not appropriate, as Defendants did, to code and bill this visit using code 99285.

---

[16]    In 2020, Relator saw specific written instructions that Intermountain had received in a payor audit that services "for constipation, earaches and colds, for example, should not be billed using [] 99285."

### f.     Patient J.S.

173.    On February 10, 2020, patient J.S., a Medicare beneficiary, presented at the emergency department at Dixie Regional Medical Center. The patient's chief complaint was "headache" and "numbness." The physician's final diagnoses were "migraine headaches and paresthesia." The physician documented a negative CT scan and negative MRI and stated that the patient "has had improvement of her symptoms in the emergency department will be discharged home to follow primary care physician. Patient is otherwise stable." It was not appropriate, as Defendants did, to code and bill this visit using code 99285.

### g.     Patient J.D.

174.    On June 5, 2020, patient J.D., a Medicare beneficiary, was seen in the emergency department at Dixie Regional Medical Center. The patient's chief complaint was "abdominal pain." The final diagnoses were "abdominal pain, nausea and vomiting, cholelithiasis, post-op pain and GERD." All threatening conditions were ruled out, and the patient was eventually sent home to follow up with her physician. It was not appropriate, as Defendants did, to code and bill this visit using code 99285.

### h.     Patient N.S.

175.    On or about March 17, 2018, patient N.S., a Medicare beneficiary, was seen in the emergency department at Delta Community Hospital. The patient's chief complaint was "Fever-Immunocompromised > 75 years." The diagnoses were "major depression and post-operative infection." After providing antibiotics, the clinician documented: "I believe that most of his symptoms ... are due to major depression." The clinician discharged the patient and documented: "I have referred him back to his primary care physician for better control and possibly switching

or changing of his medication needs." It was not appropriate, as Defendants did, to code and bill this visit using code 99285.

### i.      Patient I.S.

176.     On July 28, 2016, patient I.S. , a Medicare beneficiary, was seen in the emergency department at Sevier Valley Hospital. The patient's chief complaint was "weakness." The final diagnosis was "syncope" (*i.e.*, fainting or passing out). The medical record states the physician "did not find anything alarming or abnormal whatsoever" and ultimately discharged the patient. It was not appropriate, as Defendants did, to code and bill this visit using code 99285.

### j.      Patient D.W.

177.     On June 22, 2016, patient D.W., a Medicare beneficiary, was seen in the emergency department at Cassia Regional Hospital. The patient's chief complaint was "weakness." The final diagnosis was "acute anxiety and acute [urinary tract infection]." After the physician prescribed antibiotics and told the patient to "increase her fluids," the "patient was discharged home in stable condition." It was not appropriate, as Defendants did, to code and bill this visit using code 99285.

### k.      Patient B.C.

178.     On May 29, 2018, patient B.C., a Medicare beneficiary, was seen in the emergency department at Cedar City Hospital. The patient's chief complaint was "dizziness [and] vomiting," and the final diagnoses were "vertigo [and] vomiting." After a diagnostic workup, IV fluids, and medications, the patient was discharged home. The physician documented: "Patient will follow up as directed. No further emergency department workup is indicated as this time." It was not appropriate, as Defendants did, to code and bill this visit using code 99285.

### l.    Patient G.J.

179.    On July 29, 2018, patient G.J., a Medicare beneficiary, was seen in the emergency department at Park City Hospital. The patient's chief complaint was "eruption of skin" and "finger laceration." The final diagnoses included: "alcohol use disorder, mild, alcohol abuse; finger laceration; fall; alcohol intoxication." The patient's time in the emergency department was simply to sober up. The lacerations were cleaned and sutured (and separately billed). The patient was ultimately discharged. It was not appropriate, as Defendants did, to code and bill this visit using code 99285.

### m.    Patient D.T.

180.    On May 11, 2019, patient D.T., a Medicare beneficiary, was seen in the emergency department at Dixie Regional Medical Center. The patient's chief complaint was "dysuria" (*i.e.*, painful urination). After the patient had a diagnostic work up and was given IV fluids, she was discharged to follow up with other physicians. It was not appropriate, as Defendants did, to code and bill this visit using code 99285.

### n.    Patient M.R.

181.    On June 27, 2017, patient M.R., a Medicare beneficiary, was seen on in the emergency department at Cedar City Hospital. The patient's chief complaint was "flank pain," and the final diagnoses were "right nephrolithiasis and hydronephrosis" (*i.e.*, kidney stone disease and swelling of a kidney). After a diagnostic work up, IV fluids, and some medications, the physician documented: "The patient will continue with further conservative measures to include oral pain medications along with antiemetics. He was educated on continuing with oral hydration. No further

emergency department workup is indicated at this time." It was not appropriate, as Defendants did, to code and bill this visit using code 99285.

### o.    Patient L.T.

182.    On January 1, 2017, patient L.T., a Medicare beneficiary, was seen in the emergency department at Park City Hospital. The patient's chief complaint was "knee-pain swelling" with a final diagnosis of "locked knee." After treating pain and performing x-rays, the physician discharged the patient home with a referral to follow up with orthopedics. It was not appropriate, as Defendants did, to code and bill this visit using code 99285.

### p.    Patient S.S.

183.    On November 13, 2018, patient S.S., a Medicare beneficiary, was seen in the emergency department at Bear River Valley Hospital. The patient's chief complaint was "shoulder pain-swelling," and the final diagnosis was "anterior subluxation of right humerus, initial encounter." The patient received a diagnostic workup, and it was determined the shoulder was dislocated with no evidence of fracture. The patient was given pain medication so the dislocation could be reduced, and the patient was sent home with a sling and recommendation to follow up with an orthopedic surgeon. It was not appropriate, as Defendants did, to code and bill this visit using code 99285.

### q.    Patient T.H.

184.    On September 18, 2017, patient T.H., a Medicare beneficiary, was seen in the emergency department at Cedar City Hospital. The patient's chief complaint was "headache [and] weakness." The final diagnoses were "dehydration, headache and hyponatremia" (*i.e.*, low blood sodium). After administering IV fluids and a diagnostic work-up, the physician discharged the

patient home with instructions to "follow-up with his family doctor in the next couple of days." It was not appropriate, as Defendants did, to code and bill this visit using code 99285.

185.    On January 15, 2019, patient T.H. was seen again in the emergency room at Cedar City Hospital. This time, the patient's chief complaint was "arm pain-swelling [and] dysuria." The final diagnoses were "dehydration [and] left arm pain." The physician reported: "Upon my physical exam the patient is in no acute distress." After administering IV fluids and a diagnostic work up, the physician discharged the patient home with instructions to hydrate and follow up with orthopedics. It was not appropriate, as Defendants did, to code and bill this visit using code 99285.

### r.    Patient C.W.

186.    On May 8, 2018, patient C.W., a Medicare beneficiary, was seen in the emergency department at Dixie Regional Medical Center. The patient's chief complaint was "shortness of breath." The final diagnoses were "bronchitis and seasonal allergies." The physician documented: "CBC was normal. Chemistry panel is normal. D-dimer, troponin, BNP ae all normal. Chest x-ray showed no acute cardiopulmonary process. EKG showed no acute abnormality. Patient's feeling better after some steroids and breathing treatment ... I think she most likely has a seasonal allergy-induced bronchitis." The patient was given some prescription medications, such as an inhaler and steroids, and was sent home. It was not appropriate, as Defendants did, to code and bill this visit using code 99285.

### s.    Patient C.S.

187.    On January 2, 2018, patient C.S., a Medicare beneficiary, was seen in the emergency department at Dixie Regional Medical Center. The patient's chief complaint was "cough [and] fever." The final diagnosis was "pneumonia." After the patient was given Tylenol

and Toradol, the doctor documented: "Patient's fever improved. Patient does show some probably pneumonia on the chest x-ray. Patient was given Rocephin and azithromycin here and prescription for azithromycin home. Patient's otherwise stable." The documentation concluded: "The patient would prefer to be home. I believe this is the most appropriate setting for him at home as well. Patient is 74 but is otherwise stable and his electrolytes and his oxygen saturation are benign." Though the patient needed antibiotics, the course in the emergency department was uneventful, and the patient was relatively stable. It was not appropriate, as Defendants did, to code and bill this visit using code 99285.

### t.    Patient G.Z.

188.    On January 25, 2019, patient G.Z, a Medicare beneficiary, was seen in the emergency department at Cedar City Hospital. The patient's chief compliant was "vertigo" with final diagnoses of "near syncope [and] vertigo." A diagnostic work up was done, IV fluids were started, and aspirin was given. The patient's lab results were mostly normal or close to her baseline. The medical documentation stated: "Patient's symptoms did not return she is feeling much better as this time. With a fairly unremarkable workup and unremarkable head CT I feel comfortable letting her go home to follow up with her primary care provider as needed. Stable throughout ED course." It was not appropriate, as Defendants did, to code and bill this visit using code 99285.

### u.    Patient R.O.

189.    On January 16, 2019, patient R.O., a Medicare beneficiary, was seen in the emergency department at Dixie Regional Medical Center. The patient's chief complaint was "abdominal pain." The final diagnoses were abdominal pain and a non-urgent umbilical hernia. The documenting provider stated: "I discussed the patient's case with Dr. Lewis from general

surgery, who stated that if patient wanted it to be repaired, he would do surgery. He stated the patient will be discharged home and follow-up as an outpatient..." The final documented condition stated "stable." The documentation left it up to the patient to decide if he wanted the hernia repaired, and, if he did, it could be evaluated as an outpatient and not urgently in the emergency department. It was not appropriate, as Defendants did, to code and bill this visit using code 99285.

### v.    Patient J.P.

190.    On June 15, 2019, patient J.P., a Medicare beneficiary, was seen in the emergency department at Cedar City Hospital. The chief complaint was "diarrhea, nausea, vomiting." The final diagnoses were "gastroenteritis [and] dehydration." The patient received IV fluids and medications. The documentation stated: "Vital signs are stable. Laboratory workup is significant for elevated creatinine and GFR of 49, think this is due to dehydration. Lab workup is otherwise stable. CT abdomen and pelvis is negative. Patient has signs symptoms consistent with gastroenteritis. Recommended clear liquid diet for next 24 hours." It was not appropriate, as Defendants did, to code and bill this visit using code 99285.

### w.    Patient N.B.

191.    On May 25, 2019, patient N.B., a Medicare beneficiary, was seen in the emergency department at Dixie Regional Medical Center. The patient's chief complaint was "dizziness [and] nausea." The final diagnoses were "vertigo [and] sinusitis." The physician documented that it "is less likely that she's had some sort of acute stroke or subacute stroke but possible." It was left up to the patient on whether more definitive imaging to rule out stroke is performed. The physician also documented: "She is nonfocal on exam and doesn't have any exhibit any focal ataxia per se. I gave her the choice of doing imaging for definitive ruling out any cerebrovascular insufficiency."

The blood work and imaging came back as normal. The physician documented: "The patient was put on clarithromycin for her sinusitis. Patient was also given when necessary meclizine. Patient will follow up with ENT." The physician was not urgently concerned with a possible stroke since the patient was given the choice to rule that out with imaging. It was not appropriate, as Defendants did, to code and bill this visit using code 99285.

192.    Through these and thousands of other false and up-coded claims for physician emergency department services, Defendants violated the FCA and obtained or caused Government Healthcare Programs to pay improper reimbursements for such services.

**E.    In September 2020, Intermountain Executives Continued to Pressure Staff to "Code [ER E&M Services] More Aggressively"**

193.    Even after internal audits uncovered 70% upcoding of level 5 E&M services at Cassia and McKay in late 2019, and after Relator and other coding staff raised serious concerns about persistent upcoding in 2020, senior executives at Intermountain continued to prioritize profits over compliance and to pressure coding personnel to up-code E&M services when billing Medicare and other payors.

194.    On September 3, 2020, for example, Intermountain held a WebEx meeting to discuss the proper billing of CPT codes 99283-99285. In that meeting, Relator described how he saw instances when Intermountain billed 99285 that he believed might have been coded too aggressively. In response, Kerry Gillespie, the former divisional CFO at Intermountain, said:

> "I have a problem with that, and the reason I do is because you weren't there. And that's the problem with doing retrospective audits. You're not in the shoes of the physician. The physician should be the one that identifies that issue and identifies how much—what the medical necessity is of the patient. Now, I understand everything is retrospective, and we have to look at it from that viewpoint. But I have a problem with coders going back and determining something that is

really the physician's responsibility to determine and document. So, I'm sorry, but I'm going to respectfully disagree with that."

195.    In this WebEx meeting, Mr. Gillespie also pressured Intermountain staff to code ER E&M services more aggressively. Specifically, he admonished the coding staff in the PDC department at Intermountain not to be "so conservative that we would always pass an audit with 100%. That would be—we would leave a lot of money on the table if we did that. ... I don't want to be so conservative that we leave money on the table because that pays you all's paycheck."

196.    For Relator and the other coding staff who attended this WebEx meeting, this was an unmistakable threat from Mr. Gillespie—either the coding staff fall in line with his view on coding more aggressively, or their jobs would be in jeopardy. For example, in an email exchanged minutes later, a member of the PDC department at Intermountain wrote Relator to summarize the comments from Mr. Gillespie as:



197.    Soon after this WebEx meeting ended, another member of the PDC department sent an email to Relator to commiserate — "Did you pick up on a veiled threat during that meeting?"

198.    Later that same day, another PDC employee at Intermountain told Relator that the CFO's comments made him "really uncomfortable," that "all I heard is this is what pays your paychecks," and that "it seems pretty clear to me that [the CFO] thinks very little of coding—those with coding expertise."

199.    These statements are indicative of the pressure that Intermountain executives have put on the coding personnel to aggressively code ER E&M services for Medicare, Medicaid, and

other types of government beneficiaries.

200.    In short, the pervasive and persistent upcoding practice across the Intermountain hospitals system—as shown by external audits, internal audits, and Relator's 2020 review—occurred with the actual knowledge and encouragement of senior executives. Or, at a minimum, senior executives recklessly disregarded or deliberately ignored the fact that Intermountain's policies, procedures, and practices caused the widespread submission of level 5 E&M service codes that were up-coded and, thus, not supported by medical necessity or medical documentation.

### F.    Even After the Filing of This Action, Intermountain Continued to Minimize Its Upcoding Practice and to Avoid Refunding Overpayments

201.    Intermountain's efforts to avoid refunding Medicare and Medicaid overpayments for up-coded level 5 E&M services continued even after Relator filed this *qui tam* action in 2020.

202.    Specifically, while Intermountain agreed in 2024 to settle claims arising from the upcoding of ER E&M services at the Cassia and McKay hospitals, Intermountain did not fully disclose the broad scope of upcoding practice across its hospital system.

203.    In Relator's understanding, Intermountain did not fully disclose to the Government the findings of its internal audits of ER E&M services at other hospitals, which often found error rates well above 5%.

204.    In Relator's understanding, Intermountain also did not disclose to the Government the fact that its own executives knew the high levels of upcoding identified at Cassia and McKay showed that upcoding likely occurred at other hospitals staffed by physicians provided by UEP—such as the Intermountain Medical Center and the LDS Hospital.

205.    In short, contrary to its own written policy, *see* Ex. 3, Intermountain has continued to avoid its obligation to refund Medicare and Medicaid overpayments arising from the upcoding

of ER E&M services to level 5 that Intermountain's own audits and reviews have long identified.

### G.    Defendants UEP, SWEP, RMES, and R1 Have Knowingly Submitted or Caused the Submission of False Claims and False Statements

206.    While Intermountain reaped the greatest financial benefits from the persistent and widespread upcoding practice, Defendants UEP, SWEP, RMES, and R1 also knowingly participated in and benefitted from this practice at the Intermountain hospital locations where they supplied ER physicians or performed billing services.

207.    As discussed above, *see supra* ¶¶ 133-140, UEP and SWEP were directly involved with reviewing and appealing the findings of 2014 Noridian audit of level 5 ER E&M services.

208.    UEP and SWEP, therefore, knew that the ER physicians they provided to Intermountain routinely upcoded E&M services. Instead of correcting that improper practice in response to the Noridian audit, UEP and SWEP continued to allow and encourage upcoding.

209.    Similarly, in 2018, RMES was notified by OptumCare that its physicians were "'outliers' on the submission of claims" for ER E&M services at level 5 with "CPT 99285[.]" *See* Ex. 2. Despite this warning, RMES continued allowing and encouraging the upcoding of ER E&M visits.

210.    The knowing and improper misconduct of UEP, SWEP, and RMES resulted in the widespread upcoding of ER E&M visits uncovered in 2019 and 2020, which yielded significant financial benefits to those entities under the incentive performance provisions of their contracts with Intermountain.

211.    Finally, as the billing provider for Intermountain, R1 has long been aware of the findings of external and internal audits of ER E&M services at Intermountain, including the 2014/2015 Medicare audit by Noridian and subsequent audits by McKesson. Despite this

awareness, however, R1 ignored its obligation to ensure proper billing and, instead, relied on coding staff who lacked appropriate training and did not have the necessary certifications. In short, R1 chose to allow the upcoding practice at Intermountain to continue unabated so it could derive financial benefits under the incentive performance provisions of its contract with Intermountain.

## IX.    CLAIMS FOR RELIEF

### COUNT I

### FCA: Presentation of False Claims
### (31 U.S.C. § 3729(a)(1)(A))

212.    Relator reasserts the allegations in paragraphs 1 through 211 above as if fully set forth herein. This is a claim for treble damages and penalties under the FCA.

213.    Through the acts described above and otherwise, Defendants, by and through their agents and employees, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented to the Government materially false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

214.    The Government was unaware of the falsity of the records, statements, and claims made or submitted by Defendants.

215.    The false and fraudulent representations and claims Defendants knowingly made to the Government were material to the Government's decisions to make payments to Defendants. Had the Government actually known of the false or fraudulent nature of Defendants' representations and claims, it would have been prohibited by law from making corresponding payments to Defendants.

216. By reason of Defendants' violations of the FCA, the Government has suffered economic loss.

## COUNT II

### FCA: Using False Statements Material to False Claims Paid
### (31 U.S.C. § 3729(a)(1)(B))

217. Relator reasserts the allegations in paragraphs 1 through 211 above as if fully set forth herein. This is a claim for treble damages and penalties under the FCA.

218. Through the acts described above and otherwise, Defendants, by and through their agents and employees, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used false records or statements material to the payment of false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B).

219. Defendants' false certifications and representations were made for the purpose of ensuring that the Government paid the false or fraudulent claims, which was a reasonable and foreseeable consequence of Defendants' statements and actions.

220. The Government was unaware of the falsity of the records, statements, and claims made or submitted by Defendants and in reliance on the accuracy of these records or statements, paid false or fraudulent claims.

221. The false and fraudulent representations and claims Defendants knowingly made to the Government were material to the Government's decisions to make payments to Defendants. Had the Government actually known of the false or fraudulent nature of Defendants' representations and claims, it would have been prohibited by law from making corresponding payments to Defendants.

222.    By reason of Defendants' violations of the FCA, the Government has suffered economic loss.

## COUNT III

### FCA: Avoiding or Decreasing an Obligation to Pay
### (31 U.S.C. § 3729(a)(1)(A)(G))

223.    Relator reasserts the allegations in paragraphs 1 through 211 above as if fully set forth herein. This is a claim for treble damages and penalties under the FCA.

224.    Through the acts described above and otherwise, Defendants, by and through their agents and employees, knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, in violation of 31 U.S.C. § 3729(a)(1)(G).

225.    An "obligation" includes "an established duty, whether or not fixed, arising from an express or implied contractual ... relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

226.    Congress has defined an "overpayment" as "any funds that a person receives or retains under [the Medicare and Medicaid statutes] to which the person, after applicable reconciliation, is not entitled." 42 U.S.C. § 1320a–7k(d)(4)(B). Further, a person or entity that receives a Medicare or Medicaid overpayment must report and return the overpayment within 60 ays of the date on which the overpayment was identified. *Id*. § 1320a–7k(d)(1)–(2).

227.    Thus, "obligations" include, but are not limited to, "any overpayment [from Medicare] retained by a person after the deadline for reporting and returning an overpayment." 79 Fed. Reg. 29,843, 29,918 (May 23, 2014).

228.    Here, the Government was unaware of the falsity of the records, statements, and claims made or submitted by Defendants to conceal, avoid, or decrease their obligation to refund overpayments.

229.    The false and fraudulent representations and claims Defendants knowingly made to the Government were material to the Government's decisions to make payments to Defendants and deprived the Government of money Defendants were obligated to pay to the Government.

230.    By knowing they had over-billed, yet failing to self-disclose the misconduct to Government Healthcare Programs or to refund the excessively billed and paid amounts, Defendants violated 31 U.S.C. § 3729(a)(1)(G).

231.    By reason of Defendants' violations of the FCA, the Government has suffered economic loss.

## COUNT IV

### FCA: Conspiracy
### (31 U.S.C. § 3729(a)(1)(C))

232.    Relator reasserts the allegations in paragraphs 1 through 211 above as if fully set forth herein. This is a claim for treble damages and penalties under the FCA.

233.    Through the acts described above and otherwise, Defendants, by and through their agents and employees, conspired to commit one or more violations of the FCA—specifically, of 31 U.S.C. §§ 3729(a)(1)(A), 3729(a)(1)(B), and 3729(a)(1)(G)—in violation of 31 U.S.C. § 3729(a)(1)(C).

234.    The Government was unaware of the falsity of the records, statements, and claims made or submitted by Defendants.

235.    The false and fraudulent representations and claims Defendants knowingly made

to the Government were material to the United States' decisions to make payments to Defendants.

236.    Had the Government actually known of the false or fraudulent nature of Defendants' representations and claims, it would have been prohibited by law from making corresponding payments to Defendants.

237.    By reason of Defendants' conspiracy to commit violations of the FCA, the Government has suffered economic loss.

## X.    DEMANDS FOR RELIEF

WHEREFORE, Relator, on his own behalf and on behalf and the Government, respectfully requests that this Court:

A.    Enter judgment for the Government and Relator and against Defendants;

B.    Order Defendants to cease and desist from violating the FCA;

C.    Award the Government, through a money judgment against Defendant, three times the damages it has sustained because of Defendants' actions, plus the maximum civil penalty for each act by Defendants in violation of the FCA, as provided by 31 U.S.C. § 3729(a);

D.    Award Relator the maximum relator's share available under 31 U.S.C. § 3730(d) for bringing this action, namely, 30% of the proceeds of the action by judgment or settlement of the pending claims, which the Government has declined to intervene;

E.    Award Relator all reasonable expenses necessarily incurred in prosecution of this action, plus all reasonable attorneys' fees and costs, under 31 U.S.C. § 3730(d);

F.    Award interest on money judgments, as provided by law; and

G.    Grant such other relief for the United States and Relator as the Court deems just, necessary, and proper.

## XI.    JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Relator demands a trial by jury.

Dated: October 10, 2025

Respectfully submitted,

**BERNSTEIN LITOWITZ**
**BERGER & GROSSMANN LLP**

Li Yu *(pro hac vice)*
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1926
Email: li.yu@blbglaw.com

Mark Pugsley (Utah Bar No. 8253)
**PUGSLEY WOOD LLP**
350 E. 400 S, Suite 400
Salt Lake City, UT 84111
Tel: (801) 370-9800
Email: mark@pugsleywood.com

*Attorneys for the* Qui Tam *Relator*
*Charles J. Wolf, M.D*